## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**DAVID ANDREW STEVENSON,**

**Petitioner,**

**v.**                                                      **CASE NO. 18-3054-JWL**

**PAUL SNYDER,**

**Respondent.**

## MEMORANDUM AND ORDER

This matter is a pro se petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 by Petitioner and Kansas state prisoner David Andrew Stevenson. It comes before the Court on the issue of whether the actual innocence exception allows the Court to consider the merits of Petitioner's procedurally defaulted grounds for relief. The Court has carefully considered the arguments of both parties, the relevant state-court records, and the controlling law. For the reasons explained below, the Court concludes that Ground One of the petition fails to state a constitutional violation and must be dismissed and that Petitioner has not shown that the actual innocence exception applies to allow the Court to consider the merits of the procedurally defaulted arguments in Grounds Two through Four. Thus, this matter must be dismissed under Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts.

### I.    Background

The complex procedural history that led to this federal habeas matter is set forth in the Court's prior orders and will not be repeated in detail here. (*See* Doc. 21, p. 1-12.) For purposes of the present order, it is sufficient to say that on March 13, 2008, Petitioner's father, Walter Stevenson, "was found dead after being crushed by a hydraulic truck bed." *State v. Stevenson*, 297

Kan. 49, 50 (2013) (*Stevenson I*). Petitioner was charged with premeditated first-degree murder and the Gove County District Court held a 10-day jury trial. As the Kansas Supreme Court put it in the opinion issued in Petitioner's direct appeal[1]:

> The State presented evidence that Walter had been incapacitated by blows to his head before he suffered crushing injuries consistent with being pinned by the bed of the truck. The State's theory was that [Petitioner] and his father had been arguing and [Petitioner] murdered his father in order to gain control over the family farm and money in a family trust.
>
> To present evidence that some injuries had been inflicted before Walter was crushed, the State established there was blood spatter in areas other than where Walter was found; there had been an attempt to clean up blood; there was blood under a puddle of oil that had been spilled some distance from the truck; and there was blood on a hammer. These various blood stains matched Walter's DNA. In addition, the State presented the coroner's opinion that some injuries were inconsistent with the type of crushing force that would be expected if the truck's hydraulics had failed and that those injuries had been administered while Walter was still alive. Further, other experts opined there was no physical evidence of a catastrophic hydraulic failure, such as leaked fluid.
>
> The State pointed to Stevenson as the person who had killed Walter by presenting evidence of motive; establishing that Stevenson was the person who found Walter; presenting evidence of Stevenson's "odd" reaction to his father's death, such as "acting like he was crying"; establishing that Stevenson gave inconsistent statements; and proving inconsistencies between his version of events and the physical evidence. The State also established that Stevenson had no blood on his clothes, which made Stevenson's statement that he had attempted to free his father from the truck improbable given the large amount of blood loss at the scene.
>
> In his defense, Stevenson presented expert testimony establishing that Walter's injuries and the blood spatters were consistent with an accidental hydraulic failure. Stevenson also presented evidence of his activities that day in an effort to show he lacked the opportunity to have killed his father and staged the accident. Further, the defense experts and defense counsel attempted to cast doubt regarding whether it was possible to stage such an elaborate scene. For example, they opined it would be difficult to position Walter where he could be crushed under the truck bed if he had already been struck and rendered unconscious.

---

[1] "'[W]hen a state court has made a factual determination bearing on the resolution of a *Schlup* [actual innocence] issue, the petitioner bears the burden of rebutting this presumption by clear and convincing evidence.'" *Taylor v. Powell*, 7 F.4th 920, 932 (10th Cir. 2021) (quoting *Fontenot v. Crow*, 4 F.4th 982, 1032 (10th Cir. 2021)). There is no indication that Petitioner disputes this summary of the evidence presented at his trial and this Court provides it for context to aid in understanding the actual innocence argument Petitioner makes to this Court.

*Id.* 50-51.

There was conflicting evidence admitted at trial regarding Walter's time of death, but, broadly speaking, it appeared that Walter died sometime between 2:00 p.m. and 5:00 p.m. *See Stevenson v. State*, 2023 WL 2723285, *1 (Kan. Ct. App. Mar. 31, 2023) (unpublished) (*Stevenson III*); Appeal No. 124, 380, Vol. XXVIII, p. 37-41, 85-88; State's Trial Exhibits 20 and 24. As relevant to the issue now before this Court, Petitioner presented evidence at trial that he had taken his mother, Bonny Stevenson, to Scott City, Kansas, where they were from early afternoon until after 4:00 p.m. Petitioner's daughter, who lived in Scott City, testified that it took approximately 35 to 40 minutes to get from her house to Walter and Bonny's house. Appeal No. 124,380. Vol. XXXI, p. 144. The jury ultimately convicted Petitioner of premeditated first-degree murder and the state district court sentenced him to life in prison without the possibility of parole for 25 years. *See Stevenson I*, 297 Kan. at 51.

Petitioner pursued a direct appeal and in April 2013 the Kansas Supreme Court (KSC) affirmed Petitioner's conviction. *Id.* at 49-50. The following month, Petitioner filed in state district court a pro se motion for writ of habeas corpus under K.S.A. 60-1507. *Stevenson v. State*, 2017 WL 5180847, *2 (Kan. Ct. App. Nov. 9, 2017) (*Stevenson II*). In March 2016, the state district court denied relief. *Id.* Petitioner appealed. *Id.* In an opinion issued in November 2017, the Kansas Court of Appeals (KCOA) affirmed. *Id.* at 6.

On March 6, 2018, Petitioner filed in this Court a pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 and a memorandum in support. (Docs. 1 and 2.) United States Senior District Judge Sam A. Crow dismissed the case without prejudice in September 2019 so that Petitioner could attempt to develop evidence in the state court that might excuse the procedural default of his asserted grounds for federal habeas relief. (*See* Docs. 6 through 10 and 16.) In a

footnote in the dismissal order, Judge Crow stated: "After proper presentation of this matter in the state courts, petitioner may move to reopen this matter." (Doc. 16, p. 5 n.1.)

In February 2021, Petitioner filed in state district court a second K.S.A. 60-1507 motion. (Doc. 18, p. 1); *See Stevenson v. State*, 2023 WL 2723285, *3 (Kan. Ct. App. Mar. 31, 2023) (unpublished) (*Stevenson III*). The state district court held a hearing on the issues in June 2021 at which the State was represented by counsel and Petitioner proceeded pro se. *Stevenson III*, 2023 WL 2723285, at *3. After the hearing, the district court denied Petitioner's motion as untimely and successive and also denied a motion for DNA testing. *See id.* at *4-6.

On appeal, the KCOA affirmed the denial of the second K.S.A. 60-1507 motion but remanded for further proceedings on the motion for DNA testing. *Id.* at 8-9. Petitioner's appointed appellate counsel filed a petition for review of the KCOA rulings adverse to Petitioner and the remand proceedings began after the KSC denied petition for review in April 2023. (Doc. 18, p. 2.) After holding a hearing on the motion for DNA testing, the state district court denied the motion in a written order entered September 17, 2024. *See Stevenson v. State*, Gove County District Court Case No. 2021-CV-000002. Although Petitioner's counsel filed a notice of appeal, it does not appear that Petitioner ever docketed an appeal in the state appellate courts.

On February 27, 2025, Petitioner filed in this Court a pro se motion to reopen this federal habeas matter that Judge Crow dismissed in 2019. (Doc. 18.) The following day, this matter was reassigned to the undersigned for all further proceedings. (Doc. 19.) On March 7, 2025, the Court issued a memorandum and order to show cause (MOSC) granting the motion to reopen. (Doc. 21.) The MOSC also informed Petitioner that the Court had reviewed the operative amended petition (Doc. 7) in this matter as required by Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts:

> Rule 4 . . . requires the Court to review a habeas petition upon filing and to dismiss it "[i]f it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court." . . . .
>
> Because Petitioner is proceeding pro se, the Court liberally construes the amended petition during this review, but it may not act as Petitioner's advocate. *See James v. Wadas*, 724 F.3d 1312, 1315 (10th Cir. 2013). "[T]he court cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record." *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005). It "'may not rewrite a petition to include claims that were never presented.'" *Childers v. Crow*, 1 F.4th 792, 798 (10th Cir. 2021) (citation omitted).

(Doc. 21, p. 14.)

The MOSC explained that Ground One is subject to dismissal for failure to state a claim on which federal habeas relief may be granted because it merely alleges that the state courts erred by denying the motion for DNA testing and it does not identify a federal or constitutional right that was violated. *Id.* at 14-15. The MOSC also detailed the way in which the Court had liberally construed the remaining three asserted grounds for relief. *Id.* at 14-16. It then explained that Grounds Two through Four appear procedurally defaulted, which would prevent consideration of the merits of those grounds, but Petitioner could overcome the bar by (1) showing "'cause for the default and prejudice as a result of the alleged violation of federal law, or [(2)] demonstrat[ing] that failure to consider the claims will result in a fundamental miscarriage of justice'" because he is actually innocent. *Id.* at 16-17 (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). After explaining these concepts, the Court granted Petitioner time to show cause why this matter should not be dismissed. *Id.* at 17-21.

Petitioner timely filed his response to the MOSC on April 18, 2025. (Doc. 22.) Therein, he clarified the nature of his asserted grounds for relief in this matter. His clarifications are discussed when necessary in the analysis section below. For now, however, it is sufficient to note that Petitioner argued that Ground One asserts the violation of his constitutional rights and that

although Grounds Two through Four are procedurally defaulted, the Court should consider their merits anyway. Specifically, Petitioner argued that he had good cause for untimely filing his K.S.A. 60-1507 motion and, in the alternative, that he should be allowed to pass through the actual innocence gateway to avoid the consequences of procedurally defaulting the claims in Grounds Two through Four. (Doc. 22, p. 4-5.)

The Court carefully considered the response and, on April 22, 2025, issued a memorandum and order (M&O) noting that Petitioner had clarified the nature of the arguments in the amended petition, but had not disputed that Grounds Two through Four are procedurally defaulted. (Doc. 24, p. 9.) After rejecting Petitioner's assertion that cause and prejudice existed that allows this Court to consider the merits of the procedurally defaulted arguments, the M&O turned to Petitioner's assertion that a fundamental miscarriage of justice will occur if the Court refuses to consider the merits of his claims because he is actually innocent. *Id.* at 9-11.

The M&O noted that Petitioner offered the following as new evidence to support his actual innocence argument:  (1) cell phone tower data containing information about the location of Petitioner's cell phone and Walter's cell phone on the day Walter died; (2) records of unanswered calls to Walter's cell phone that day; and, perhaps, (3) anticipated DNA testing results. *Id.* at 12. The Court determined that a limited Pre-Answer Response (PAR) from Respondent was appropriate, so it ordered Respondent to file a PAR "address[ing] Petitioner's argument that the failure to consider the merits of the procedurally defaulted grounds asserted in the amended [petition] will result in a fundamental miscarriage of justice." *Id.* at 13. The M&O further provided Petitioner time in which to file a reply to the PAR if he wished to do so. *Id.* at 14.

Respondent timely filed the PAR on August 20, 2025. (Doc. 27.) In addition, Respondent provided the Court with the underlying relevant state-court records. (*See* Docs. 28 and 29.)

Petitioner timely filed his reply to the PAR on September 17, 2025. (Doc. 31.) The Court has carefully considered the parties' arguments and the records before it and is ready to rule on whether this matter should proceed past the Rule 4 review.

## II.    Analysis

### A.    Ground One

In the operative amended petition, filed in April 2018, Petitioner articulates Ground One in this way:    "State Court denied post motion for DNA testing creating a 'Fundamental Miscarriage of Justice' supporting 'Actual Innocence' claim." (Doc. 7, p. 5 (all errors in original).) As supporting facts for Ground One, Petitioner states:

> Petitioner filed a post denial motion for DNA Testing along with request for an order of REENACTMENT of State's theory. Where the theory was that the petitioner ren[d]ered the victim unconscious with some unknown object then placed his 170 pound body between the truck frames while somehow simultaneously reaching across 5 to 7 feet to operate controls necessary to lower the hoist on to him to coverup the crime. The item to be tested (coveralls) is in actual possession of the state and related to investigation and never been tested.

*Id.* (all errors in original). The March 2025 MOSC explained that "Ground One of the amended petition does not identify a federal or Constitutional right that was violated by the state courts denying a post-conviction motion for DNA testing. Thus, it fails to state a claim on which federal habeas relief may be granted and it is subject to dismissal from this action." (Doc. 21, 15.)

In his April 2025 response to the MOSC, Petitioner "clarified" that Ground One asserts a violation of his right to due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution based on the prosecution's failure to disclose evidence—a report prepared by Kenneth B. Madgwick—that was favorable to the defense as required by *Brady v. Maryland*, 373 U.S. 83 (1963). (Doc. 22, p. 2; Doc. 22-14, p. 1.) The report recounted Mr. Madgwick's examination of the truck involved in Walter's death and did not involve DNA testing

or results in any way.

The argument made in Ground One of the operative amended petition is materially different than the argument made in Ground One as clarified in Petitioner's response to the MOSC. To change Ground One from an allegation that the state courts erred in denying a post-conviction motion for DNA testing (Doc. 7, p. 5) to the assertion of a *Brady* violation (Doc. 22, p. 2) may be done only by filing a second amended petition. *See* Rule 2 of the Rules Governing Section 2254 Cases in the United States District Courts ("The petition must: (1) specify all the grounds for relief available to the petitioner; (2) state the facts supporting each ground . . . ."). In this case, however, Petitioner has already once amended his petition as a matter of course. (*See* Doc. 7.) Thus, under Federal Rule of Civil Procedure 15(a)(2), he "may amend [his] pleading only with the opposing party's written consent or the court's leave." *See also* 28 U.S.C. § 2242 (stating that a habeas petition "may be amended or supplemented as provided in the rules of procedure applicable to civil actions").

The operative amended petition was filed in 2018. The document in which Petitioner sought to alter the nature of Ground One was filed in 2025, which is well outside the one year federal habeas statute of limitations. As the Tenth Circuit has stated:

> A proposed claim asserted outside the limitations period is generally time-barred. But an amendment "relates back to the date of the original pleading" when "the amendment asserts a claim . . . that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." A court therefore should not grant a habeas applicant leave to amend to assert new claims outside AEDPA's limitations period unless there exists "a common core of operative facts uniting the original and newly asserted claims."

*Pacheco v. Habti*, 62 F.4th 1233, 1240 (10th Cir. 2023) (citations omitted).

Here, there is not a sufficient common core of operative facts uniting the argument in Ground One in 2018 that the state courts erred in denying a motion for DNA testing and the

argument in 2025 that Ground One is intended to assert a *Brady* violation related to Mr. Madgwick's report. Thus, even if Petitioner formally moved to amend Ground One of his petition, the Court would deny the motion. Ground One of the controlling amended petition (Doc. 7) fails to state a claim on which federal habeas relief may be granted, as explained in the MOSC, and must be dismissed under Rule 4. (*See* Doc. 21, p. 14-15.)

### B.  Grounds Two through Four

With respect to Grounds Two through Four, the focus at this point in these proceedings is not the merits of the arguments therein. The focus is whether Petitioner has shown that a failure to consider the procedurally defaulted claims in this matter would result in a fundamental miscarriage of justice because he is actually innocent of the crime of conviction.[2] Only if Petitioner does so may the Court consider the merits of Grounds Two through Four.

### i.  Standards

To proceed under the actual innocence exception, Petitioner "must make a colorable showing of factual innocence." *See Beavers v. Saffle*, 216 F.3d 918, 923 (10th Cir. 2000). This is because "actual innocence 'serves as a gateway through which a petitioner may pass'" despite the procedural default of his or her asserted grounds for federal habeas relief. *Fontenot v. Crow*, 4 F.4th 982, 1040 (10th Cir. 2021) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013)). Petitioner is not required to conclusively exonerate himself; rather, his "burden at the gateway stage is to demonstrate 'that more likely than not any reasonable juror would have reasonable doubt.'" *Fontenot*, 4 F.4th at 1030 (quoting *House v. Bell*, 547 U.S. 518, 538, 553 (2006)). He

---

[2] (*See* Doc. 21, p. 16 (MOSC agreeing with Judge Crow's determination that the grounds for relief in the operative amended petition are procedurally defaulted); Doc. 22 (response to MOSC that does not dispute the finding of procedural default of Grounds Two through Four and asserts exceptions to rule barring consideration of the merits of procedurally defaulted claims); Doc. 24, p. 10, 13 (M&O "conclud[ing] that Petitioner has failed to sufficiently show cause and prejudice that would allow this Court to consider the merits of his procedurally defaulted arguments" and ordering a PAR on the applicability of the actual innocence exception).)

must do this by coming forward with "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). "An actual innocence claim must be based on more than the petitioner's speculations and conjectures." *Taylor v. Powell*, 7 F.4th 920, 927 (10th Cir. 2021).

The United States Supreme Court has explained that this Court must decide whether the actual innocence exception applies "'in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.'" *Schlup*, 513 U.S. at 328. As the MOSC noted, however,

> tenable actual-innocence gateway pleas are rare, arising only in an extraordinary case. The gateway should open only when a petition presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.

(Doc. 21, p. 19 (quoting *Fontenot*, 4 F.4th at 1031 (citations and quotation marks omitted).)

## ii. Discussion

The Court has carefully read and considered the PAR (Doc. 27), as well as Petitioner's reply to the PAR (Doc. 31) and the attached exhibits (Docs. 31-1 through 31-3). In addition, the Court has reviewed the four boxes of state-court records provided by Respondent, including the transcripts of Petitioner's 2009 jury trial, the evidence presented at the trial, the opinion issued in the direct appeal, and the records and opinions of the subsequent post-conviction proceedings in state court.[3] The Court also has carefully considered Petitioner's notice to the Court (Doc. 30), the

---

[3] The Court notes that the state court records were received damaged. Volume VIII of the appellate record in Case No. 124,380 contains the transcript of the K.S.A. 60-1507 trial that occurred on April 21, 2015. The top right corner of page 7 is missing, as is the entirety of page 8; the pages appear to have been ripped out of the transcript. The Court does not believe that this missing page, which contains testimony from Patricia Scalia, the then-director of the State

attached letter (Doc. 30-1), and Petitioner's previous filings in this matter.

As a reminder, Petitioner based his arguments for the actual innocence exception on two types of new evidence.[4] The first relates to cell phones and includes (1) anticipated cell phone tower data regarding the locations of Petitioner's cell phone and perhaps Walter's cell phone on the day that Walter died and (2) evidence showing unanswered calls to Walter's cell phone on that day. (Doc. 24, p. 12.) Highly summarized, Petitioner contends that the location data and unanswered calls would establish that Walter died during a time in which Petitioner was miles away in Scott City, Kansas, with family members. The second type of evidence Petitioner identified as supporting his claim to the actual innocence exception is anticipated results from DNA testing of the coveralls Walter wore at the time of his death. *See id.*

In the PAR, Respondent argues that Petitioner has not *presented* any "new evidence" to support application of the actual innocence exception. (Doc. 27, p. 4-5.) He points out that there is no DNA evidence before this Court, nor has Petitioner submitted to this Court any cell phone records or data that were not admitted at trial. *Id.* at 6-7. Rather, Petitioner's assertions of new evidence are merely "bald statements" and Petitioner's failure to produce actual cell phone records, cell tower records, or DNA test results is fatal to Petitioner's actual innocence argument. *Id.* at 5. This leaves the Court, in Respondent's view, unable to conduct the analysis necessary to determine whether Petitioner has shown that the actual innocence exception applies. *Id.* at 7-8.

---

Board of Indigents Defense Services, would materially affect the analysis contained in this order.

[4] The Court recognizes that in his reply to the PAR, Petitioner additionally identified as new, reliable evidence: a picture of Walter's cell phone, covered in blood, as it was found after his death; testimony at the K.S.A. 60-1507 evidentiary hearing about unanswered phone calls to Walter's cell phone on the afternoon and/or evening of his death; and phone records showing unanswered phone calls to Walter's cell phone during that time. The Court has considered these pieces of evidence as they relate to the question of whether evidence of the unanswered phone calls is "evidence of innocence so strong that [the C]ourt cannot have confidence in the outcome of the trial unless the [C]ourt is also satisfied that the trial was free of nonharmless constitutional error." (*See* Doc. 21, p. 19 (quoting *Fontenot*, 4 F.4th at 1031 (citations and quotation marks omitted).)

Finally, Respondent argues that even if the evidence was before the Court and was deemed reliable, Petitioner's assertions of the impact that evidence would have on a reasonable juror are unpersuasive. *Id.* at 8-11. Thus, Respondent asks this Court to dismiss this matter. *Id.* at 12.

In his reply to the PAR, Petitioner asserts that Respondent's use of the word "if" in the PAR demonstrates uncertainty regarding Petitioner's actual innocence. (Doc. 31, p. 1.) He also identifies in his reply two "actual facts" that were not presented to the jury. *Id.* at 1-2. First, a photograph attached to his motion to reopen this case that shows Walter Stevenson's cell phone covered in blood, as it was found near his body after his death. *Id.* at 1; (*see also* Doc. 18-1, p. 1 (photograph)). Second, evidence of five unanswered phone calls to Walter's cell phone on the day of his death, consisting of phone bills Petitioner has attached to his reply to the PAR. (Doc. 31, p. 2; Docs. 31-1 through 31-3). Petitioner also points to testimony by Wade Ricker and Paul Oller, Petitioner's trial counsel, at the K.S.A. 60-1507 evidentiary hearing in April 2015, concerning the existence of unanswered phone calls to Walter's cell phone on the day he died. (Doc. 31, p. 2.)

As an initial matter, the Court agrees with Respondent that to the extent Petitioner bases his actual innocence argument on DNA results and cell phone location data from cell towers, his argument fails. To qualify for the actual innocence exception, Petitioner must present more than speculations; he must come forward with new reliable evidence. *See Schlup*, 513 U.S. at 324; *Taylor*, 7 F.4th at 927. Because Petitioner has presented neither DNA test results nor cell phone location data to this Court, this Court cannot meaningfully consider the reliability of such evidence or how it would have affected a reasonable juror's decision on Petitioner's guilt. Thus, Petitioner has failed to make the showing required for this evidence to support applying the actual innocence exception here.

Petitioner has, however, presented evidence related to unanswered calls to Walter's cell

phone on the day of his death, in the form of the phone bills and testimony given at the K.S.A. 60-1507 evidentiary hearing regarding the unanswered calls to Walter's cell phone, and a picture of Walter's cell phone as it was found after his death. (Doc. 18-1, p. 1; Docs. 31 through 31-3.) Petitioner maintains that this is new, reliable evidence that, had it been presented at trial, more likely than not would have left any reasonable juror with reasonable doubt as to Petitioner's guilt.

Even assuming solely for the sake of argument that this evidence is both new and reliable, the Court is not persuaded that that if it had been presented at trial, it is more likely than not that any reasonable juror would have had reasonable doubt that Petitioner was guilty. At its base, Petitioner's argument rests on the premise that unanswered phone calls would lead a reasonable juror to conclude that Walter had died before the phone calls were made, during a time in which Petitioner had an alibi. (*See* Doc. 31, p. 2.) Petitioner made a very similar argument to the state courts, which the KCOA summarized in this way:

> [Walter's] phone received five calls that went unanswered between 3:49 p.m. and 6:05 p.m. on the day of his death. The coroner testified [at trial that] the time of death was between 2 p.m. and 5 p.m. [Petitioner] arrived at the farm between 4:30 p.m. and 4:45 p.m. [Petitioner] believed location data on the phone would show the phone did not move during the timeframe it received the unanswered calls. Therefore, the time of death had to be before the 3:49 p.m. call, when [Petitioner] was in Scott City, 41 miles away.

*Stevenson III*, 2023 WL 2723285, at *4.

As a reminder, there is no new evidence of the locations of any cell phone currently before this Court. Nevertheless, Petitioner maintains that the unanswered phone calls between 3:48 p.m. and 6:05 p.m. on the day of Walter's death establish that time of death occurred while Petitioner was in Scott City. In order to succeed on his argument that the actual innocence exception should allow this Court to consider the merits of his procedurally defaulted claims, Petitioner must convince the Court that it is more likely than not that a reasonable juror aware of this evidence of

the unanswered phone calls would have had reasonable doubt that he killed Walter.

As noted above, the Court has carefully read the records and transcripts of Petitioner's various state-court proceedings. *See Schlup*, 513 U.S. at 328 (holding that when considering an actual innocence argument, "[t]he habeas court must make its determination . . . 'in light of all the evidence.'"). Based on a holistic view of the evidence, considered with the evidence Petitioner has now provided regarding unanswered phone calls and that Walter's cell phone was found in a pool of blood after his death, the Court concludes that there is ample evidence to support a reasonable conclusion that the calls to Walter's phone went unanswered for reasons other than his death.

Walter died on March 13, 2008. *Stevenson I*, 297 Kan. at 50. Attorney Dale Pike testified at Petitioner's trial that on March 4, 2008, he met with Walter; Walter's daughter, Peggy Ricker; and Peggy Ricker's husband, Gary Ricker. Appeal No. 124,380, Vol. XXVI, p. 214-15. During that meeting, Walter was asked whether he had a cell phone. *Id.* at 228. Mr. Pike testified that Walter "said no, I don't like those things, or kind of not, you know, they're just kind of not something I want to do." *Id.* Walter was then encouraged to get a cell phone "for safety, for [his] protection," and he later purchased a cell phone. *Id.*

Similarly, Peggy Ricker testified at trial that Walter did not like cell phones and found them annoying, and she agreed that "Mr. Pike had talked him into getting one." Appeal No. 24,380, Vol. XXVII, p. 68-69. Mrs. Ricker also testified that when she and Walter were picking out his cell phone, Walter needed to make sure "that he could hear the ringer, because he was supposed to wear hearing aids" but sometimes he did not. *Id.* at 69-70. In light of Mr. Pike and Mrs. Ricker's testimony, a reasonable juror could have concluded that Walter did not answer his cell phone on the afternoon of his death for reasons other than that he had already died, including because Walter did not hear the phone ring or because he simply chose not to answer his cell phone, which he

14

found annoying and had only recently been talked into purchasing. Evidence that the phone was found near Walter's body and covered in blood does not alter the reasonableness of either of those conclusions.

Simply put, contrary to Petitioner's argument, evidence of unanswered phone calls on the day of Walter's death would not necessarily cause a reasonable juror to believe that Walter died before the unanswered calls, while Petitioner was in Scott City. Thus, the evidence would not necessarily provide reasonable doubt as to Petitioner's guilt. The existence of other reasonable causes for the unanswered calls was recognized by Petitioner's trial counsel, by the state district court, and by the KCOA.

At the 2015 evidentiary hearing, when asked whether an unanswered phone call at 4:00 p.m. on the day Walter died "would be significant to prove the death occurred prior to that time," trial counsel replied:   "That would - - I mean I guess that that would be up to the jury to determine whether they were unanswered because he was deceased, or whether he didn't have his phone, or he chose not to answer it. I don't know."[5]  Appeal No. 124,380, Vol. VIII, p. 22. Similarly, during the second K.S.A. 60-1507 proceeding, the district judge "found that the unanswered calls did not establish a time of death—rather, 'That just establishes the calls weren't answered.'" *Stevenson III*, 2023 WL 2723285, at *4. On appeal, the KCOA agreed, holding: "The calls could have been unanswered because Walter was deceased, he did not have his phone, or he chose not to answer it." *Id.* at *7.

This Court agrees with this reasoning and finds that the evidence Petitioner has presented

---

[5] As Petitioner points out in his response to the PAR (Doc. 31, p. 2), his 60-1507 counsel then asked whether trial counsel thought "it's important that the jury should have known that they [*sic*] were unanswered phone calls to him at 4:00 on that day of his death?" Appeal No. 124,380, Vol. VIII, p. 23. Trial counsel replied, "I think that that would have been important." *Id.* This line of questioning does not, as Petitioner asserts in his amended petition, demonstrate that trial counsel "confessed to his own [ineffective assistance of counsel by saying: 'The jury should have known of the unanswered calls.'" (Doc. 7, p. 6.)

to support his argument for the actual innocence exception is not as impactful as Petitioner asserts. The Court has considered all of the evidence presented at trial, as well as all of the new evidence Petitioner has presented in this proceeding. After this comprehensive review, the Court concludes that Petitioner has not shown that if the evidence of unanswered phone calls to Walter's cell phone on the afternoon of his death and the photograph of the cell phone covered in Walter's blood had been seen by the jury, no reasonable juror would have found Petitioner guilty beyond a reasonable doubt. *See Schlup*, 513 U.S. at 327. Accordingly, Petitioner has not made the showing required for the actual innocence exception to be applied so that this Court may consider the merits of Grounds Two through Four of the amended petition in this matter. Thus, Grounds Two through Four clearly cannot provide a basis for federal habeas relief and must be dismissed under Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts.

### III.    Conclusion and Certificate of Appealability

Rule 4 of the Rules Governing § 2254 Cases in the United States District Courts requires the Court to review a habeas petition upon filing and to dismiss it "[i]f it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court." Rules Governing § 2254 Cases, Rule 4, 28 U.S.C.A. foll. § 2254. Ground One of the operative amended petition in this matter fails to allege a violation of the Constitution or federal law; thus it cannot entitle Petitioner to federal habeas relief. *See 2*8 U.S.C. § 2254 (authorizing federal habeas relief "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States"). Grounds Two through Four were procedurally defaulted in the state court and Petitioner has not shown that this Court should nevertheless consider the merits of the claims therein. Accordingly, Rule 4 requires that this matter be dismissed.

Under Rule 11 of the Rules Governing Section 2254 Cases in the United States District

Courts, "the district court must issue or deny a certificate of appealability [(COA)] when it enters a final order adverse to the applicant."

> When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The failure to satisfy either prong requires the denial of a COA. *Id.* at 485. The Court concludes that its procedural rulings in this matter are not subject to debate among jurists of reason. Therefore, the Court declines to issue a certificate of appealability.

**IT IS THEREFORE ORDERED THAT** this matter is dismissed with prejudice because Ground One of the operative amended petition fails to state a ground on which federal habeas relief can be granted and Grounds Two through Four are procedurally defaulted and Petitioner has not shown that the Court should consider their merits despite the procedural default. No certificate of appealability will issue.

**IT IS SO ORDERED.**

DATED:   This 26th day of September, 2025, at Kansas City, Kansas.

S/ John W. Lungstrum
JOHN W. LUNGSTRUM
United States District Judge